## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| RITA LAVORGNA,<br>    Plaintiff, | :<br>: |
| | : |
| v. | :   Case No. 3:19-cv-00007 (VLB) |
| | : |
| HAMDEN SHORELINE ORAL AND<br>MAXILLOFACIAL SURGERY<br>ASSOCIATES, P.C.<br>    Defendant. | :<br>:<br>:   July 29, 2020<br>: |

### MEMORANDUM OF DECISION GRANTING
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, [ECF NO. 46]

This employment discrimination action is brought by Plaintiff, Rita Lavorgna, a former dental surgical assistant of the Defendant, Hamden Shoreline Oral and Maxillofacial Surgery Associates, P.C. ("Defendant").[1]   Defendant terminated Plaintiff's employment, and Plaintiff alleges that Defendant's termination of her employment was motivated by discriminatory animus based on her age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 ("ADEA") and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60, *et seq.*, as well as disability discrimination in violation of the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA"), codified as amended at 42 U.S.C. § 12101 *et seq.*, and violation of Conn. Gen. Stat. § 31-51q,

---

[1] Defendant filed a Supplemental Corporate Disclosure Statement informing the Court that "it filed a name change with the Secretary of State, State of Connecticut, on December 3, 2019, wherein it changed its name to Coastal Connecticut Oral & Maxillofacial Surgery, P.C."  [ECF No. 36].  For clarity's sake, the Court will simply refer to Defendant as "Defendant."

"Liability of employer for discipline or discharge of employee on account of employee's exercise of certain constitutional rights."

On February 14, 2020, Defendant filed a motion for summary judgment and memorandum in support thereof on all claims.   [ECF Nos. 46, 47].   For the following reasons, the Defendant's motion for summary judgment is GRANTED.

## I. MATERIAL FACTS

The Court draws the following facts from the Parties' Local Rule 56(a) Statements of Material Facts as supported by evidence in the record.

"Plaintiff was hired in or about 1990 to work as a surgical dental assistant for [Defendant's] Practice at [Defendant's] Hamden location."   [ECF No. 47-2 (Defendant's Local Rule 56(a)1 Statement of Undisputed Material Facts ("Def.'s Stmt.") ¶ 5)]; [ECF No. 55-1 (Plaintiff's Local Rule 56(a)2 Statement of Facts ("Pl.'s Stmt.") ¶ 5)].   "At the time that Plaintiff was hired in 1990, she was, and remained throughout her 27 years of employment with the Practice, hearing impaired." Def.'s Stmt. ¶ 12; Pl.'s Stmt. ¶ 12.

In 2013, Defendant opened a new location in Wallingford, Connecticut. Def.'s Stmt. ¶ 17; Pl.'s Stmt. ¶ 17; [ECF No. 1 ¶ 11].   "At the time that the Wallingford office was opened, members of the staff were given the opportunity to transfer from the Hamden office to the Wallingford office," but "Plaintiff remained at the Hamden office."   Def.'s Stmt. ¶¶ 18, 19; Pl.'s Stmt. ¶¶ 18, 19. Three of the surgical assistants who transferred from the Hamden location to the

2

new Wallingford location were Denise Trip, Carol Maturo, and Michelle Provencher.  Def.'s Stmt. ¶ 21; Pl.'s Stmt. ¶ 21.

Carol Maturo, in a sworn affidavit, stated that she "elected to transfer to the Wallingford office, in significant part because I did not want to work with Plaintiff."  [ECF No. 47-5 ¶ 6].  She also stated in the affidavit that she "did not enjoy working with Plaintiff and found her to frequently be rude, condescending, hostile and abusive," *id.* ¶ 7, and that "[t]ransferring to Wallingford was a positive change for me and I found that my working environment improved significantly after I left the Hamden office."  *Id.* ¶ 8.

Following the transfer of the three surgical assistants to Wallingford, Defendant hired new replacement employees.  Def.'s Stmt. ¶¶ 25, 26; Pl.'s Stmt. ¶¶ 25, 26.

Plaintiff had no official supervisory role in the Hamden office.  Def.'s Stmt. ¶ 9; Pl.'s Stmt. ¶ 9; [ECF No. 47-7 (Transcript of Plaintiff's Deposition dated December 9, 2019) ("Pl. Depo. Tr.") at 40:16-20 ("Q.  Were you ever responsible to supervise or manage other employees?  A.  No.  Q.  Were you ever asked to do so?  A.  No.").

Despite having no supervisory role in the Hamden office, Plaintiff took it upon herself to instruct the new hires as to office procedures including safety items such as needle disposal, and other topics.  [ECF No. 1 ¶¶ 18-20, 22]; Def.'s Stmt. ¶ 28; Pl.'s Stmt. ¶ 28.  The new hires did not want to be told what to do by

3

Plaintiff, which frustrated Plaintiff.  Def.'s Stmt. ¶¶ 28, 29; Pl.'s Stmt. ¶¶ 28, 29

("Plaintiff instructed them . . . They did not perform their jobs to the satisfaction

of the physicians. . . .  their performance deficiencies and lack of attention

caused safety issues in the office."); Pl. Depo. Tr. at 57:8-58:16:

> They just felt that they could just do whatever they did to get the job
> done and nothing else, and they would leave me with everything
> else.  They didn't like to be told what to do.  They never wanted to
> know how to do anything right.  They just -- when the safety issues
> came up and I had to tell the office manager about them, they were
> resentful, you know, and they would just make complaints left and
> right.  They wouldn't do anything they were told over and over.
> There were procedures that had to be done to shut down a room, and
> nothing was ever done.  Medicine cabinets were left unopened.  They
> were supposed to be locked.  Tanks were supposed to be shut off.
> I'm busy doing something else, come over, everybody is gone, and
> everything was left for me to do.  The safety issues had to do with
> sutures.  I raised these issues, and they were resentful about it.
> They just never wanted to -- it continued to happen.  So, now, we
> have suture needles that haven't been found.

In August and December 2013, Defendant's Hamden Office Manager

Antonia "Annie" Pietrandrea spoke to Plaintiff after Plaintiff's "co-workers had

complained that [she] w[as] yelling and bossing them around."  [ECF No. 47-12 at

1].  Office Manager Pietrandrea also told Plaintiff at those times that Plaintiff was

"creating a hostile work environment and this was very serious," and that she

"needed to treat people with respect and also not order people around."  *Id.*

In March 2014, Dr. Philip Conforti also spoke to Plaintiff "regarding [her]

inappropriate behavior and gave [her] specific instructions as to what he

expected of [her]."   *Id.*   Plaintiff states that "[i]n 2014, when Defendant instructed Plaintiff not to instruct the other employees, she stopped."  Pl.'s Stmt. ¶ 28.

Defendant had an official "Office Policy" that stated as follows:

> When groups of people work together, it is necessary for everyone to observe certain rules of acceptable social conduct.   Violation of these rules may result in disciplinary action ranging from a verbal warning, to a written warning, to immediate discharge.

[ECF No. 47-10 at 4].

On May 30, 2014, Plaintiff yelled at a number of co-worker's in Defendant's Hamden office break room.  Def.'s Stmt. ¶ 42; Pl.'s Stmt. ¶ 42.  The next workday Plaintiff's co-worker Josie Ardito sent an email to Office Manager Pietrandrea stating "Hi Annie!  We really need a memo about bullying and threatening people at work.  I don't want to say what happened but it's not okay for some people to treat others like we are kids.  There were 4 of us in break room when it took place.  Not sure if u got any complaints from my coworkers."  [ECF No. 47-4 at 4-5].

Following this, Office Manager Pietrandrea asked co-workers who were present to provide a written statement regarding the May 30, 2014 incident, which they did, each confirming that Plaintiff had raised her voice and acted in a threatening manner to her co-workers.   Def.'s Stmt. ¶ 45; Pl.'s Stmt. ¶ 45; [ECF No. 47-4 at 6 (Follow-up statement of Josie Ardito: "This happened 5/30/14 at around 4:45 pm.  I was cleaning dishes in the break room when Antonio ask Rita If she needed any help?  she immediately started to scream and said how she has to do everything.  And she pointed her finger at us and said if any of you tell

annie that I just yell at you guys I'm going to tell everyone here.  She walked away

[and] we all looked at each other like what just happened.")]; [ECF No. 47-5 at 5

(Statement of Carol Maturo):

> The incident happened on Friday May 30 at 4:50. Rita entered the
> kitchen and addressed myself, Josie, antonio and ally.  Yelling and
> pointing her finger at each one of us.  Saying that she is sick and
> tired of doing everything herself and she's not going to do it
> anymore.  She was referring to keeping rooms tidy and shutting off
> view boxes etc.  this is something we all do.  We don't know what
> else she expects.  She was threatening us after that again with the
> finger in our faces saying and if you tell Annie I just yelled at all if
> [sic: of] you I'm going to tell her about all the things you guys do.  I
> said to her don't talk to me that way and I walked out if [sic: of the]
> kitchen.  One moment later she came to me and said, i hope you
> weren't thinking I meant you.  I had to treat it like a group so it would
> look better.  That was the situation and we all felt threatened.  Ally on
> the way out was upset and said to me why Is she yelling at me?  I
> don't even work here yet.]

*Id.*; [ECF No. 47-6 at 5 (Statement of co-worker Antonio Gonzalez):

> On Friday, May 30th at 4:45 pm I was in the kitchen area with all my
> co-workers but Rita, waiting for 5 pm to punch out.  When Rita walks
> in to the kitchen area I ask her if she needed help with something
> before I punch out and she started 'Is our responsibility to put back
> in place the light box and refill the bottles to clean the suction lines
> at the end of the day, she is tired of nobody doing their job at the end
> of the day.'  At that point, the way she was talking, I just left the
> kitchen and rush to the rooms to do what she requested, but
> everything was in place and the bottles were perfectly filled. I
> understand that the rant was a little bit longer but I was not present
> for it.]

*Id.*  In a follow-up email, Mr. Gonzalez stated that one time previously Plaintiff had

gotten "really upset" at him when she mistakenly thought that he had improperly

sterilized some instruments.  [ECF No. 47-6 at 7].

6

Plaintiff admitted in writing that on May 30, 2014 she "was annoyed" at finding various items not completed, raised her voice at her co-workers, and later apologized to Carol Maturo.  [ECF No. 47-12 at 10-11].

As a result of the May 30, 2014 incident, Plaintiff received a written warning from Defendant's Office Manager Pietrandrea on June 19, 2014.  [ECF No. 47-12 at 11-12].  The warning directed Plaintiff as follows:

- Communicate in a professional manner at all times.
- Treat your co-workers with respect and in a courteous manner.
- You are to bring any work related issues to me (Annie) or if it needs immediate attention please speak with Dr. Conforti or Dr. Johnson.
- You are not to attempt to give directions or criticism to your co-workers, remember that you are all equal and you have no authority over anyone.

*Id.* at 11.

Another incident occurred on May 2, 2016, in which the details are disputed but Josie Ardito claims that Plaintiff yelled at her after she failed to include a certain instrument on a surgical tray for a doctor performing surgery.  In Office Manager Pietrandrea's notes concerning her and Dr. Conforti's counseling of Plaintiff, she states "Rita then proceeded to say that she did not yell at Josie but did say to her I told you to place that instrument on his tray.  Rita was told that it is not her place to tell staff what to do."  [ECF No. 47-12 at 14].

On August 15, 2017, Plaintiff's co-worker Allesandra Rosadini entered Dr. Conforti's private office in tears, reporting that Plaintiff had berated her about a surgical tray that was not properly prepared.  Def.'s Stmt. ¶ 61; Pl.'s Stmt. ¶ 61; [ECF No. 47-3 (Affidavit of Dr. Conforti) ¶ 50]; [ECF No. 47-12 at 13 (Dr. Conforti's

notes describing Ms. Rosadini as "in tears")].  Following this incident Defendant terminated Plaintiff.  Def.'s Stmt. ¶¶ 63-70.  Conforti Aff. ¶ 52 ("After the incident that occurred on August 15, 2017, I conferred with my partners and we concluded that Plaintiff had been given enough opportunities to change her behavior over a period of four years, and that it was clear that she was not willing to do so.").

 Plaintiff was 56 years old when she was terminated.  Def.'s Stmt. ¶ 78; Pl.'s Stmt. ¶ 78.  Plaintiff's co-workers Denise Trip, Carol Maturo, and Michelle Provencher were 65, 53, and 46 years old respectively at that time.  Def.'s Stmt. ¶ 79; Pl.'s Stmt. ¶ 79.  The three doctors who decided to terminate Plaintiff were Dr. Conforti, who was 61 at that time, Dr. Johnson, who was 42, and Dr. Parker, who was 60 years old.  Def.'s Stmt. ¶ 65.  Another employee, Carol Sauza, worked for Defendant from 2004 to 2014, when she voluntarily separated at age 61.  Def.'s Stmt. ¶ 81; Pl.'s Stmt. ¶ 81.

At no time did Plaintiff ever advise the doctors or any office manager that she believed the disputes with her co-workers were in any way related to her hearing impairment or her age, nor did any of Defendant's employees make any disparaging statements about Plaintiff's age or hearing ability.  Def.'s Stmt. ¶¶ 82-84; Pl.'s Stmt. ¶¶ 82-84.

Plaintiff filed this Complaint on January 3, 2019.  [ECF No. 1].

## II.    Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of proving that no genuine factual disputes exist.  *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought."  *Id*. (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  This means that "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000); *see also Welch-Rubin v. Sandals Corp.*, No. 3:03-cv-00481, 2004 WL 2472280, at *4 (D. Conn. Oct. 20, 2004) ("At the summary judgment stage of the proceeding, [the moving party is] required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient.") (citing *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996)); *Martinez v. Conn. State Library*, 817 F. Supp. 2d 28, 37 (D. Conn. 2011).  Put another way, "[i]f there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be

denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315-16 (2d Cir. 2006) (internal quotation marks and citation omitted).

A party who opposes summary judgment "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb*, 84 F.3d at 518. Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726-27 (2d Cir. 2010).

### III.    DISCUSSION

#### A.    Age-Based Discriminatory Discharge Claims

Plaintiff's claims of discriminatory treatment are analyzed using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The *McDonnell Douglas* standard requires that Plaintiff establish a *prima facie* case of discrimination by showing (1) that she is part of a protected class; (2) that she was qualified for her position; (3) that she suffered an adverse employment action; and (4) that the circumstances surrounding the employment action give rise to an inference of discrimination. *Id*. The Second Circuit has noted that the burden to establish a *prima facie* case is "minimal" or "*de minimis*." *Woodman v. WWOR–TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005).

10

If Plaintiff can establish a *prima facie* case, the burden shifts to the Defendant to proffer a legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. At this stage, Defendant need only proffer, not prove, the existence of a nondiscriminatory reason for its employment decision. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981). "This burden is one of production, not persuasion; it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (internal quotations omitted).

If Defendant meets its burden of production, the burden shifts back to Plaintiff to show that the legitimate, nondiscriminatory reason offered by the Defendant is mere pretext for illegal employment discrimination. *McDonnell Douglas*, 411 U.S. at 804. "Although the intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143.

Here, Plaintiff's *prima facie* case, despite requiring only a *de minimis* showing, founders on two of the four required grounds.

First, Plaintiff argues that she was qualified for her position: "It w[ould] be rather difficult for a jury to find that Plaintiff was not qualified for her job. Plaintiff worked for Defendant for 27 years [and] [s]he was viewed as the 'back bone' of

the office."  Pl.'s Opp. at 33.  She also argues that "Defendant has taken an extreme position in labeling Plaintiff as a 'bully.'"  *Id.* at 34.  The Court disagrees.

It is well-settled that "the ultimate inquiry" regarding job qualifications "is whether an employee's performance 'meets his employer's legitimate expectations.'"  *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir. 1985) (quoting *Huhn v. Koehring Co.*, 718 F.2d 239, 244 (7th Cir. 1983)).  Defendant argues that the "ability to get along with co-workers is a reasonable qualification for the job," [ECF No. 47 at 7], which it undoubtedly is in a small surgical practice such as Defendant's.  But the evidence of record shows that Plaintiff had a history of improper interactions with coworkers and an inability to treat them with respect and civility.

Even before Defendant opened its Wallingford office in 2013, Plaintiff had issues interacting with co-workers.  As Carol Maturo stated under oath regarding her reasons for transferring to Wallingford, "I elected to transfer to the Wallingford office, in significant part because I did not want to work with Plaintiff. I did not enjoy working with Plaintiff and found her to frequently be rude, condescending, hostile and abusive. Transferring to Wallingford was a positive change for me and I found that my working environment improved significantly after I left the Hamden office."  [ECF No. 47-5 ¶¶ 6-8].

After the Wallingford office opened, Plaintiff's problems persisted.  As mentioned, Plaintiff had to be verbally counseled in August and December 2013

12

by Office Manager Pietrandrea, after Plaintiff's "co-workers had complained that [she] w[as] yelling and bossing them around." [ECF No. 47-12 at 1]. Office Manager Pietrandrea also told Plaintiff at those times that Plaintiff was "creating a hostile work environment and this was very serious," and that she "needed to treat people with respect and also not order people around." *Id.* In March 2014, Dr. Conforti spoke to Plaintiff "regarding [her] inappropriate behavior and gave [her] specific instructions as to what he expected of [her]." *Id.* In May 2014 the break room incident occurred, resulting in a written warning to Plaintiff, and another incident occurred on May 2, 2016, which required verbal counseling by Dr. Conforti and Office Manager Pietrandrea. [ECF No. 47-12 at 14]. And finally, on August 15, 2017, Plaintiff's co-worker Rosadini entered Dr. Conforti's private office in tears, reporting that Plaintiff had berated her about a surgical tray that was not properly prepared. Def.'s Stmt. ¶ 61; Pl.'s Stmt. ¶ 61; [ECF No. 47-3 (Affidavit of Dr. Conforti) ¶ 50]; [ECF No. 47-12 at 13 (Dr. Conforti's notes describing Ms. Rosadini as "in tears")].

In addition, in a sworn affidavit, Plaintiff's co-worker Josie Ardito states that "Plaintiff was frequently confrontational towards myself and other surgical assistants, creating a difficult working environment," and that "[a]s a result of the Plaintiff[']s behavior, I requested that the Defendant address the issue of bullying and threatening at work as Plaintiff[']s conduct was inappropriate and unacceptable." [ECF No. 47-4 at 3]. Plaintiff's co-worker Antonio Gonzalez also

13

stated, in a sworn affidavit, that "Plaintiff was frequently confrontational towards myself and other surgical assistants, creating a difficult working environment." [ECF No. 47-6 at 3].

In sum, the Court finds that Defendant had a reasonable employment requirement that employees get along with each other, which was enshrined in its Office Policy: "When groups of people work together, it is necessary for everyone to observe certain rules of acceptable social conduct.  Violation of these rules may result in disciplinary action ranging from a verbal warning, to a written warning, to immediate discharge."  [ECF No. 47-10 at 4].  Courts in this Circuit have found similar policies reasonable.  *Jones v. Yonkers Pub. Schs.*, 326 F. Supp. 2d 536, 544 (S.D.N.Y. 2004) ("Regardless of his argument that his job performance was admittedly 'fair' in quality, plaintiff did not work under solitary conditions.  Getting along with one's coworkers is an essential component of satisfactory job performance.").  The Court agrees.  And the Court finds that Plaintiff did not meet this requirement because she was unable to restrain herself from injecting her views on safety and other related topics into the workplace, often with a raised voice and in an inappropriate manner.  Plaintiff admits this: "I was annoyed . . . I did raise my voice and addressed everyone in the room." [ECF No. 47-12 at 9].  Because of this Plaintiff fails to meet element two of her *prima facie* age discrimination case, namely that she was qualified for the job.

14

In addition to not being qualified for the job, as regards Plaintiff's *prima facie* age discrimination case, Plaintiff has failed to adduce any evidence tying Defendant's termination of her employment to any age-related animus on the part of Defendant's decision makers.

"[A]n individual plaintiff may establish a prima facie case by 'showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion illegal under' Title VII."   *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 218 (2015) (quoting *Furnco Constr. Corp. v. Waters*, 438 U. S. 567, 576 (1978)).  "[A] showing of disparate treatment 'is a recognized method of raising an inference of discrimination for purposes of making out a prima facie case.'  Raising such an inference, however, requires the plaintiff to show that the employer treated him or her 'less favorably than a similarly situated employee' outside of the protected group. . . . A similarly situated employee is one 'similarly situated in all material respects' to the plaintiff."   *Raspardo v. Carlone*, 770 F.3d 97, 126 (2d Cir. 2014); *Lu v. Chase Investment Servs. Corp.*, 412 F. App'x 413, 418 (2d Cir. 2011) (finding no disparate treatment where plaintiff failed to identify comparator who committed similar infraction but was not disciplined).

Here, Plaintiff has not alleged and does not argue that there were younger "similarly situated employees" who were treated more favorably than she, by, for example, being retained despite having interpersonal relationship issues in

15

circumstances similar to Plaintiff's.  Plaintiff does argue that her co-workers, who she faults for failure to abide by proper safety and operational procedures, and who were generally younger than her, were not terminated, but that is not a proper comparison to Plaintiff's situation.  Plaintiff points to no co-worker who was repeatedly discourteous to their co-workers, or who was chastised and retained, yet warned that she could be terminated if she continued to be discourteous to her co-workers.  The Court finds that there were no employees "'similarly situated in all material respects' to the plaintiff."  *Raspardo*, 770 F.3d at 126; *Lu*, 412 F. App'x at 418 (finding no disparate treatment where plaintiff failed to identify comparator who committed similar infraction but was not disciplined).  Defendant argues that "[n]o inference of discrimination can arise to satisfy this prong of a *prima facie* case by making a comparison of the discipline received for differing conduct."  [ECF No. 47 at 12].  The Court agrees, as courts in this District have found.  *See McKinney v. Dep't of Transp.*, 168 F. Supp. 3d 416, 425 (D. Conn. 2016) (no *prima facie* case of discrimination where conduct did not bear a "reasonably close resemblance" to the conduct for which plaintiff was disciplined).

Additionally, the Court agrees with Defendant that Defendant's "decision makers' own ages undermine an inference of discrimination regarding Plaintiff's termination."  [ECF No. 47 at 12].  Plaintiff was 56 when she was terminated, Dr. Conforti was 61, Dr. Johnson was 42 and Dr. Parker was 60.  Pl.'s Stmt. ¶ 65.  As

Defendant argues, "[t]he difference in the Plaintiff's age and the decision makers' respective ages is significant."   [ECF No. 47 at 12].   *See Meyer v. McDonald*, 241 F. Supp. 3d 379, 390-91 (E.D.N.Y. 2017*), aff'd sub nom Meyer v. Shulkin*, 722 F. App'x 26 (2d Cir. 2018) ("When the person who allegedly discriminated against plaintiff is a member of the same protected class as plaintiff, the court applies an inference against discrimination."); *see also Palak v. St. Francis Hosp.*, No. 14-Civ-4383, 2015 WL 3682805, at *8 (E.D.N.Y. June 12, 2015) ("[A]n inference against discrimination exists where the person who participated in the allegedly adverse decision is also a member of the same protected class.... In other words, if a decision maker is in the same protected class as plaintiff, claims of discrimination become less plausible.").  This is not to say that a person of the same protected class could not discriminate on the basis of the mutual classification, however the likelihood is diminished and thus the other factors tending to show a discriminatory intent are more important.

In the absence of evidence exhibiting a disparity in treatment as between Plaintiff and one or more similarly situated employees outside her protected class, "[a]n inference of discriminatory intent may be established by, *inter alia*, the employer's invidious comments about others in the employee's protected group; or the sequence of events leading to the plaintiff's discharge."  *Sassaman v. Gamache*, 566 F.3d 307, 312 (2d Cir. 2009).

17

In determining whether an utterance of an age-related nature is probative of discriminatory intent with respect to a challenged adverse employment action, courts look to the following factors: "(1) who made the remark (i.e., a decisionmaker, a supervisor, or a low-level coworker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made, (i.e. whether it was related to the decisionmaking process)." *Vogel v. CA, Inc.*, 44 F. Supp. 3d 207, 223 (D. Conn. 2014) (quoting *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010)), *aff'd* 662 F. App'x 72 (2016). "Generally, 'remarks made by someone other than the person who made the decision adversely affecting the plaintiff may have little tendency to show that the decision-maker was motivated by discrimination.'" *Vale v. City of New Haven*, 197 F. Supp. 3d 389, 400 (D. Conn. 2016) (quoting *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007)). And "'[t]he more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination.'" *Tolbert v. Smith*, 790 F.3d 427, 437 (2d Cir. 2015).

Here, Plaintiff admits that no age-related disparaging remarks were made by anyone employed by Defendant. Pl.'s Stmt. ¶ 84 ("The Practice is not aware of anyone at the Practice, doctors or staff members, having made any disparaging statements about Plaintiff's age throughout her 27 years of employment with the

18

Practice, nor has the Plaintiff claimed that such statements were made. . . . Admitted.").

That being so, and given that there is no evidence of anything untoward regarding "the sequence of events leading to the plaintiff's discharge," *Sassaman*, 566 F.3d at 312, nor any evidence that Defendant treated Plaintiff less favorably than similarly situated employees outside her protected class, Plaintiff is incapable of establishing a *prima facie* case for age-based discriminatory discharge under the ADEA (Count Two) or the CFEPA (Count Three).

Even if Plaintiff *could* establish a *prima facie* case of age-based discriminatory discharge, Defendant has put forth a legitimate, nondiscriminatory reason for terminating Plaintiff, namely, her inappropriate behavior toward her co-workers.  As outlined above, Plaintiff's behavior was abusive and persistent, even in the face of written warnings forbidding such behavior.  Courts in this Circuit have found similar behavior to be a legitimate, nondiscriminatory reason for terminating an employee.  *See Gorecke v. United Parcel Serv., Inc.*, No. 11-CV-6591 (MAT), 2014 WL 1315390, at *1, *6 (W.D.N.Y. Apr. 1, 2014) (defendant justified in firing plaintiff employee following "a number of verbal and physical altercations with other UPS employees"); *Ahmed v. New York City Health and Hosp. Corp.*, No. 06-Civ-6685 (LAP), 2008 WL 918830, at *7 (S.D.N.Y. Mar. 31, 2008) (defendant justified in firing plaintiff employee following "confrontational

behavior towards supervisors and colleagues," along with various violations of formal workplace policies).

Finally, Plaintiff cannot establish that Defendant terminated her as a pretext for age discrimination, given that there is no evidence that any of Defendant's employees ever said anything about her age, nor any other age-related evidence that might point to some reason for Defendant to terminate her on that basis.

In sum, given the complete paucity of evidence regarding any kind of age-related animus on Defendant's part, and Defendant's legitimate, nondiscriminatory reason for terminating Plaintiff, the Court grants Defendant summary judgment on Plaintiff's ADEA and age-related CFEPA claims.

## B.    Disability-Based Discriminatory Discharge Claims

To state a *prima facie* case of disability discrimination under the ADA and the CFEPA, Plaintiff must show: "(1) the employer is subject to the ADA; (2) the plaintiff is disabled within the meaning of the ADA or perceived to be so by her employer; (3) she was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; (4) she suffered an adverse employment action; and (5) the adverse action was imposed because of her disability."  *Davis v. New York City Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015), *see also Eaddy v. City of Bridgeport*, 156 Conn. App. 597, 603-04 (2015) (*prima facie* elements under CFEPA).

20

First, although it is undisputed that Plaintiff has a hearing disability, as discussed, *supra*, Plaintiff was unable to interact appropriately with her co-workers on a sustained basis, meaning she was not "qualified to perform the essential functions of" her job under the requirements for establishing a *prima facie* case.  *Davis*, 804 F.3d at 235.

Second, Plaintiff has proffered no evidence supporting an inference that she was terminated *because of* her hearing disability.  Indeed, Plaintiff admits that no employee of Defendant in her 27 years in Defendant's employ ever made a single disparaging remark about her hearing.  Pl.'s Stmt. ¶ 83.  Even if Plaintiff's co-workers made disparaging statements about her hearing, that would not be evidence of the *decision-makers* reasons for terminating her employment.  "Generally, 'remarks made by someone other than the person who made the decision adversely affecting the plaintiff may have little tendency to show that the decision-maker was motivated by discrimination.'"  *Vale*, 197 F. Supp. 3d at 400 (quoting *Tomassi*, 478 F.3d at 115); *see also Krachenfels v. North Shore Long Island Jewish Health Sys.*, No. 13-CV-243 (JFB) (WBW), 2014 WL 3867560, at *20 (E.D.N.Y. July 29, 2014) (noting evidence of non-decision maker's alleged discriminatory animus does not establish decision-maker had the same animus).

Nor can Plaintiff claim liability under a cat's paw theory.  "[T]he 'cat's paw' metaphor now 'refers to a situation in which an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no

21

discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action.'"  *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 272 (2d Cir. 2016) (quoting *Cook v. IPC Intern. Corp.*, 673 F.3d 625, 628 (7th Cir. 2012) (Posner, *J.*).  "Because the supervisor, acting as agent of the employer, has permitted himself to be used 'as the conduit of [the subordinate's] prejudice,' that prejudice may then be imputed to the employer and used to hold the employer liable for employment discrimination."  *Id.* (quoting *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990)).  "In other words, by merely effectuating or 'rubber-stamp[ing]' a discriminatory employee's 'unlawful design,' the employer . . . [opens] itself to . . . [be] successfully sued."  *Id.* (quoting *Nagle v. Marron,* 663 F.3d 100, 117 (2d Cir. 2011)).

This avenue is foreclosed by the fact that the employer's decision to terminate Plaintiff was based on incidents which she admits occurred but dismisses as having been caused by her poor hearing.  Thus, she does not claim that the employer terminated her based on a single uncorroborated complaint of a single biased co-worker.

Plaintiff has failed to make out a *prima facie* case for disability discrimination.  But even if Plaintiff *could* establish a *prima facie* case of disability discrimination, Defendant has put forth, as outlined above, a legitimate, nondiscriminatory reason for terminating Plaintiff, namely, her inappropriate

behavior toward her co-workers.  As discussed, Plaintiff's behavior was abusive and repeated, even in the face of written warnings forbidding such behavior. Courts in this Circuit have found similar behavior to be a legitimate, nondiscriminatory reason for terminating an employee.  *Gorecke*, 2014 WL 1315390, at *1, *6 (defendant justified in firing plaintiff employee following "a number of verbal and physical altercations with other UPS employees"); *Ahmed*, 2008 WL 918830, at *7 (same).

Given the complete lack of evidence regarding any kind of disability discrimination on Defendant's part, and Defendant's legitimate, nondiscriminatory reason for terminating Plaintiff, the Court grants Defendant summary judgment on Plaintiff's ADA and disability related CFEPA claims.

C.    Conn. Gen. Stat. § 31-51q

"Section 31-51q of the Connecticut General Statutes is a cause of action for violation of the right to free speech under both the United States and Connecticut Constitutions."  *Brown v. Office of State Comptroller*, 211 F. Supp. 3d 455, 477-78 (D. Conn. 2016), *aff'd in part*, *appeal dismissed in part sub nom. Brown v. Halpin*, 885 F.3d 111 (2d Cir. 2018).

Section 31-51q reads, in relevant part,

Any employer . . . who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4, or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working

**relationship between the employee and the employer, shall be liable to such employee . . . .**

*Brown*, 211 F. Supp. 3d at 478 (quoting Conn. Gen. Stat. § 31-51q).

"To succeed on a claim under this statute, a plaintiff must demonstrate that:

> (1) [S]he was exercising rights protected by the First Amendment to the United States Constitution (or an equivalent provision of the Connecticut Constitution); (2) [s]he was fired [or otherwise disciplined] on account of [her] exercise of such rights; and (3) [her] exercise of [her] First Amendment rights did not substantially or materially interfere with [her] bona fide job performance or with [her] working relationship with [her] employer.

*Id.* (quoting *Ozols v. Town of Madison*, No. 3:11-cv-1324 (SRU), 2012 WL 3595130, at *3 (D. Conn. Aug. 20, 2012) (internal citations and quotations omitted)).  Of note, "the protections of § 31–51q [a]re not limited to speech on public property but, rather, extended to employee speech in the private workplace as well." *Schumann v. Dianon Sys., Inc.*, 304 Conn. 585, 599 (2012) (citing *Cotto v. United Techs. Corp.*, 251 Conn. 1, 16 (1999)).  "A clear prerequisite to the application of § 31–51q, however, is that the speech at issue must be constitutionally protected; only the 'exercise ... of rights guaranteed by the first amendment to the United States [c]onstitution or section 3, 4 or 14 of article first of the [c]onstitution of the state' falls within the ambit of the statute." *Id.* at 600 (quoting Conn. Gen. Stat. § 31-51q).  "[I]n evaluating the constitutionality of . . . restrictions on an employee's speech, a court must arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of

24

the . . . employer, in promoting the efficiency of the public services it performs."
*Id.* at 601.  "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of [the speech], as revealed by the whole record. . . . An employee's speech addresses a matter of public concern when the speech can be fairly considered as relating to any matter of political, social, or other concern to the community."  *Id.* at 602.

Here, Plaintiff argues that her co-workers were delinquent in the performance of their duties, and that since some of those duties involved items, such as suture safety, that could have impacted the safety of patients at the Hamden office, Plaintiff's discussions about them with management were matters of public concern.  [ECF No. 55 at 22 (citing cases standing for the proposition that "safety issues are a matter of public concern.")].

Defendant argues that Plaintiff's speech was only about operational, non-safety related issues, and that Plaintiff's cited cases hold that employee complaints about safety are only matters of public concern when they impact the public at large, such as when the speech was directed to the "abuse of disabled patients resulting in injury or death," or speech about "problems with the ventilation systems where patients with infectious diseases are treated."  [ECF No. 58 at 3].  But that is not quite right, as Plaintiff's cases make clear that basic workplace safety has been considered a matter of public concern for purposes of determining liability under Section 31-51q.  *See, e.g.*, *McClain v. Pfizer, Inc.*, No.

25

3:06-cv-1795 (WWE), 2011 WL 2533670, at *2 (D. Conn. June 27, 2011) (employee complaints about odor in the workplace and workbenches being placed too close to area where laboratory experiments were conducted were matters of public concern because "safety in the workplace is a matter of public concern." *Id.* (quoting *Munafo v. Metro. Transp. Auth.,* 285 F.3d 201, 212 (2d Cir. 2002)).

As to Defendant's argument that Plaintiff's speech only concerned operational, not safety-related issues, the Court is unable to determine on this record whether that is true or not. But that dilemma is immaterial because it is clear as a matter of law that (i) Plaintiff was not terminated because she raised these potentially safety-related issues, and (ii) Plaintiff's manner of speaking "substantially or materially interfere[d] with the employee's bona fide job performance or the working relationship between the employee and the employer." Conn. Gen. Stat. § 31-51q.

First, as Defendant argues:

Plaintiff was not terminated because she raised issues or concerns regarding the operations of the Practice. Indeed, Plaintiff's issues regarding her co-workers' alleged mistakes had gone on without any negative reaction against her by the Practice for several years. The Practice even addressed the various concerns she raised in varying ways including memos to the staff and verbal direction and correction. The final exchange which precipitated Plaintiff's termination concerned whether or not her co-worker had properly set up a surgical tray. Although this issue certainly is not one of protected public concern, even if it were, Plaintiff was terminated because of the way she addressed it; namely, yelling at her coworker, pointing her finger and acting aggressively. The substance of the dispute was ultimately irrelevant, but Plaintiff's display of hostility could not continue.

26

[ECF No. 47 at 26 (citations omitted)].  The Court agrees, because the evidence of record makes clear, as discussed, that Plaintiff was terminated for her inappropriate behavior toward her co-workers, and not because she raised issues of a potentially safety-related nature with management.  As outlined above, Plaintiff's behavior towards her co-workers was abusive and repeated, even in the face of written warnings forbidding such behavior.  And she was instructed to not bring these matters directly to her coworkers' attention only after she proved unable to do so civilly.  Courts in this Circuit have found similar behavior to be a legitimate, nondiscriminatory reason for terminating an employee.  *See Gorecke*, 2014 WL 1315390, at *1, *6 (defendant justified in firing plaintiff employee following "a number of verbal and physical altercations with other UPS employees"); *Ahmed*, 2008 WL 918830, at *7 (same).

In addition, Plaintiff's manner of speaking "substantially or materially interfere[d] with the employee's bona fide job performance or the working relationship between the employee and the employer," Conn. Gen. Stat. § 31-51q, because positive interpersonal relationships with co-workers was a prerequisite for adequate job performance, but Plaintiff could not comply with Defendant's reasonable job requirements.  Thus, by the very text of the statute, Plaintiff has not established that Defendant violated Conn. Gen. Stat. § 31-51q.

**IV.    CONCLUSION**

For the foregoing reasons, the Court GRANTS Defendant's Motion for Summary Judgment.  [ECF No. 46].  The Clerk is instructed to close this case and enter Judgment in Defendant's favor.


_____*/s/*_____
Vanessa L. Bryant
United States District Judge


SO ORDERED at Hartford, Connecticut this 29th day of July 2020.

28